IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | CRIMINAL ACTION FILE |
| | NO.  4:12-CR-28-02-HLM-WEJ |
| AMY BEARDEN, | |
| Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Amy Bearden's Motion to Suppress Evidence [48] and Motion to Suppress Statements [60].  The Court conducted an evidentiary hearing on said Motions on February 4, 2013, which has been transcribed [64] (hereafter "Tr.").  On the basis of the testimony and documentary evidence produced at the hearing and the briefs of counsel,[1] the undersigned **REPORTS** that no Fourth or Fifth Amendment violations occurred here; therefore, the undersigned **RECOMMENDS** that defendant's Motions to Suppress Evidence[48] and Statements [60] be **DENIED**.

---

[1] See Brief in Support of Defendant's Motion to Suppress [66] (hereafter "Def.'s Br."), and Government's Response to Defendant's Motion to Suppress Evidence [67] (hereafter "Gov't Resp.").

I.    **STATEMENT OF FACTS**

In May 2012, Special Agent Michael Karnbach of the Georgia Drugs and Narcotics Unit approached federal Drug Enforcement Administration ("DEA") Special Agent Christopher Mueller with information he had received from the Whitfield County Sheriff's Department and a defendant cooperating with the Federal Bureau of Investigation. (Tr. 4-5.) Specifically, Agent Karnbach told Agent Mueller that an employee of the Living Well Pharmacy had been stealing scheduled narcotic drugs (which are under the purview of the DEA) from the Pharmacy and turning them over to that cooperating defendant for resale. (Id. at 5.) Defendant Bearden worked at Living Well Pharmacy. (Id. at 6.)

On June 4, 2012, law enforcement conducted surveillance at Living Well Pharmacy and of its employee, co-defendant Sheila Cagle. (Tr. 5-6.) The agents observed Ms. Cagle meet with an individual later identified as defendant Amy Johnson. (Id. at 5.) A subsequent consensual interview between law enforcement and Ms. Johnson disclosed that she had received two bottles of oxycodone from Ms. Cagle. (Id. at 5-6.) A concurrent inventory of the drugs on hand at the Living Well Pharmacy determined that two bottles of oxycodone were missing, and a review of

2

surveillance video from the Pharmacy showed that Ms. Cagle had taken those bottles. (<u>Id.</u> at 6, 21.)[2]

Believing that the "cat was out of the bag" after the interview with Ms. Johnson, the agents elected to proceed quickly with their investigation in the event that there was further evidence that could be seized that day. (Tr. 6-7.)[3] Thus, the agents first went to Ms. Cagle's residence at approximately 9:45 p.m. on June 4, conducted an interview, and seized her cellular telephone. (<u>Id.</u> at 7, 19.) The agents subsequently learned that Mr. Johnson had traveled to Ms. Cagle's home to warn her about the investigation. (<u>Id.</u> at 7-8.)

Because the potential conspirators had received warning of law enforcement's activities, the agents were concerned that any evidence at Ms. Bearden's home could be destroyed; thus, because it would be more expeditious than getting a search

---

[2] Although it was not clear from the record, at some point video surveillance had also shown Ms. Bearden take Schedule II narcotics, place them in a bag, and give the bag to Ms. Cagle, who placed it in her purse. (Tr. 39-41.)

[3] Agents learned that Ms. Johnson and Ms. Cagle were related, and feared that Ms. Cagle might receive warning that police had seized drugs and were investigating the theft and distribution of pills. (Tr. 7.) In fact, the two had been communicating via text messages. (<u>Id.</u>) When agents arrived at Ms. Cagle's residence, Ms. Johnson's husband, Sammy Johnson, was there, which confirmed the agents' suspicions that word had spread about the investigation. (<u>Id.</u> at 7-8.)

3

warrant, they elected to travel to her home despite the late hour to conduct a "knock and talk."[4]  (Tr. 8, 17, 27-28.)  Six agents (dressed in plain clothes) traveled in two unmarked vehicles to defendant's residence in Murray County, Georgia.  (Id. at 8-9, 20.)  The officers were armed, but at no time were any guns brandished.  (Id. at 9, 11, 20, 22.)

Ms. Bearden's home is in a rural area; as the officers proceeded down her long driveway, Agent Mueller recognized her pickup truck and observed that a light was on at the residence.  (Tr. 9.)  The officers exited the vehicles; Agent Mueller and Sergeant Paul Woods of the Whitfield County Sheriff's Office went to the residence's front porch; Agent Karnbach stood at the bottom of porch stairs; and the other three officers either remained in their vehicle or stood at a distance away from the porch.  (Id. at 9, 27.)  The front porch light was on, and the time was 11:45 p.m. (Id. at 9, 19-20, 27.)

Agent Mueller knocked on the front door, and Jason Bearden, the defendant's husband, came to the door and greeted them.  (Tr. 9.)  Agent Mueller introduced

---

[4] A "knock and talk" is an "investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for the police interest."  United States v. Norman, 162 F. App'x 866, 869 (11th Cir. 2006) (per curiam).

4

himself, displayed his DEA credentials, introduced the other two officers standing close by, told him that he was interested in speaking to Ms. Bearden, and asked if they could come inside. (Id. at 9-10.) Mr. Bearden invited Agent Mueller, Sergeant Woods, and Agent Karnbach into the residence. (Id.) He apologized for the crowded condition of the home and called for his wife to come out and meet with the officers. (Id. at 10.) Their children were asleep; thus, the agents sought to be as quiet as possible. (Id. at 22.)[5]

When Ms. Bearden appeared, Agent Mueller told her that he was there to speak to her about her employment and about theft that had occurred of drugs from Living Well Pharmacy. (Tr. 10.) Ms. Bearden responded, "Well, I didn't take many." (Id.) Agent Mueller then told Ms. Bearden that she as not under arrest, that she did not have to answer his questions, and that the officers would leave her house at any time if she so requested. (Id.) The record does not reflect that she ever refused to talk or that she ever asked the officers to leave. (Id. at 11.) Agent Mueller did not provide the so-called Miranda warnings to Ms. Bearden because he did not

---

[5] There was no testimony indicating that, despite the late hour, Mr. and Mrs. Bearden had been asleep or that they were dressed in sleep attire.

AO 72A
(Rev.8/82)

feel that she was in custody; he would have allowed her to move freely around her home had she desired.  (Id. at 31-32.)

Agent Mueller then asked if there was a place where they could sit and talk (given that the home's front room was very small).  (Tr. 11.)  Ms. Bearden invited the officers to join her in the living room; Agents Mueller and Karnbach sat with her while Sergeant Woods asked Mr. Bearden if he would come outside with him because it was so crowded inside.  (Id. at 11, 27.)  According to Agent Mueller, he never threatened Ms. Bearden, she appeared to understand what he was saying, and he understood what she was saying.  (Id. at 11.)

During the conversation, Ms. Bearden admitted that she had been stealing pills from the Pharmacy and giving them to others who had run out of medications.  (Tr. 12.)  She also stated that sometimes people would bring medications to her and she would use them.  (Id.)  Ms. Bearden also stated that she was going to make some drug deliveries, so there would be some pills in her truck.  (Id.)  Agent Mueller then asked Ms. Bearden for consent to search her residence (including the truck), and she agreed.  (Id. at 12, 14.)  He then completed a consent to search form, which provides as follows:

6

1.    I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the persons, places or things to be searched.)

Residence at 166B Floodtown Circle, Eton, Georgia
2012 Nissan Pickup License Ga. C4H-4761

2.    I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.

3.    I FREELY CONSENT TO THIS SEARCH.

(Gov't Ex. 1; see also Tr. 13, 32.)

Agent Mueller then presented the form to Ms. Bearden, asked her to sign it, and she did.  (Gov't Ex. 1; see also Tr. 12, 32.)  After Ms. Bearden signed the form, Agent Mueller took it out on the front porch where Mr. Bearden was, explained to him what was going on, and obtained his signature on the form.  (Tr. 13, 32.)  Agents Mueller and Karnbach signed the form as witnesses.  (Id. at 32.)

After execution of the consent to search form, the officers began their search. (Tr. 14.)  Agent Karnbach located a number of pill bottles containing medications in other individuals' names in the kitchen, and agents Duane Holmes and Jeff Silvers located two pills bottles in other individuals' names in the pickup truck.  (Id. at 14,

7

16.)[6]  Ms. Bearden explained that some of those pills the officers found had been given to her by others (which she would take herself or give away) and that some were supposed to be delivered to others.  (Id. at 14, 16.)  Ms. Bearden denied having received anything of value in exchange for these medications.  (Id. at 41-42.)

Agent Mueller testified that Ms. Bearden was very calm during the encounter and extremely helpful.  (Tr. 15.)  Moreover, after talking to Ms. Bearden and her husband (who reported that he knew she was taking pills that were not prescribed for her, that he wanted her to stop but was unsure of how to help her, and that she appeared to be a hypochondriac), Agent Mueller was concerned about the defendant's health.  (Id.)

When the search was over, Agent Mueller explained to the Beardens (who had been friendly and polite the entire time) that the agents would present their case to the United States Attorney's Office and make a determination of what to do next, and then they left.  (Tr. 16.)

_____

[6] Although there may have been another vehicle on the Bearden's property that night, Agent Mueller only recalls officers searching the pickup.  (Tr. 32-33.)  The Government agreed that it would only attempt to introduce evidence found in the home and the pickup.  (Id. at 43.)

8

## II.  **THE INDICTMENT**

A grand jury for the Northern District of Georgia returned a multi-count Indictment against Sheila Cagle, Amy Bearden, Amy Johnson, and Jeremiah Fiek. United States v. Cagle, et al., Crim. Indict. No. 4:12-CR-28-HLM (N.D. Ga. Sept. 25, 2012) [1].  The Indictment asserts that all defendants did knowingly combine, conspire, confederate, agree and have a tacit understanding with others known and unknown to the Grand Jury to violate 21 U.S.C. § 841(a)(1), that is, to knowingly and intentionally possess with intent to distribute and dispense and to distribute and dispense a controlled substance in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). (Id., Count One.)   The Indictment continues by asserting that said conspiracy involved oxycodone, a prescription drug designated as a Schedule II controlled substance, which was possessed and distributed for other than a legitimate medical purpose and not in the usual course of professional practice.  (Id.)  The Indictment further alleges in Counts Two through Six the specific dates and drugs that these defendants knowingly and intentionally did possess with intent to distribute and dispense and did distribute and dispense.  (Id., Counts Two-Six.)  The Indictment concludes with a forfeiture provision.

9

### III.   **ANALYSIS**

Defendant Bearden challenges through these two motions the warrantless search of her home and pickup truck, the seizure of certain evidence in those two locations, and the potentially incriminating statements that she made to law enforcement officers during an interview.

The Court first addresses the officers' presence at the residence. "The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971));[7] see also United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991) (en banc) (no warrant necessary for officers to approach house to question the occupants).  "'Absent express orders from the person in

------

[7] The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

10

possession,' an officer may 'walk up the steps and knock on the front door of any man's 'castle,' with the honest intent of asking questions of the occupant thereof.'" Taylor, 458 F.3d at 1204 (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)).   "Thus, '[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just an any private citizen may.'"   Id. (quoting Estate of Smith v. Marasco, 318 F.3d 497, 519 (3d Cir. 2003)).  Police may conduct a "knock and talk" without even reasonable suspicion of criminal activity.  United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000).

Given that the officers' presence at the home was lawful, "[f]ederal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001); see also United States v. Cruz-Roman, 312 F. Supp. 2d 1355, 1361-62 (W.D. Wash. 2004) (officer may conduct a "knock and talk" at a residence, "during which an officer knocks on a residence door, hoping that the occupant will voluntarily speak with him and/or open the door").  Agent Muller and his colleagues obviously hoped

11

that, by knocking on defendant's door and talking to her, she would give them

consent to search.  That is what occurred.[8]

The Court is somewhat troubled by the late hour at which Agent Mueller

began this "knock and talk" (i.e., 11:45 p.m.).  However, the record shows that the

_____

[8] Defendant questioned Agent Mueller at the hearing about why he did not obtain a search warrant.  (Tr. 17-19.)  In Kentucky v. King, 563 U.S._, 131 S. Ct. 1849 (2011), the Supreme Court provided numerous reasons why law enforcemcent may not want to do so:

> First, the police may wish to speak with the occupants of a dwelling before deciding whether it is worthwhile to seek authorization for a search.  They may think that a short and simple conversation may obviate the need to apply for and execute a warrant.  Second, the police may want to ask an occupant of the premises for consent to search because doing so is simpler, faster, and less burdensome than applying for a warrant.  A consensual search also "may result in considerably less inconvenience" and embarrassment to the occupants than a search conducted pursuant to a warrant.  Third, law enforcement officers may wish to obtain more evidence before submitting what might otherwise be considered a marginal warrant application.  Fourth, prosecutors may wish to wait until they acquire evidence that can justify a search that is broader in scope than the search that a judicial officer is likely to authorize based on the evidence then available.  And finally, in many cases, law enforcement may not want to execute a search that will disclose the existence of an investigation because doing so may interfere with the acquisition of additional evidence against those already under suspicion or evidence about additional but as yet unknown participants in a criminal scheme.

563 U.S._, 131 S. Ct. at 1860 (internal citations omitted).

12

front porch light was on, the adult occupants came immediately to the door when Agent Mueller knocked (i.e., only the children were asleep), and there is no evidence that the adults had been sleeping or were dressed in sleep attire.[9]   Although a "suspect does not consent to a search of his residence when his consent to the entry into his residence is prompted by a show of official authority," United States v. Ramirez-Chilel, 289 F.3d 744, 751 (11th Cir. 2002), that was not the case here. Agent Mueller's testimony shows that he made no threats, brandished no weapons, and made no demand for admission into the home; instead, the record shows that Mr. Bearden freely invited the officers into his residence after they explained why they were there.

Defendant and her husband also executed a written consent to search form. Police officers may search, without a warrant or probable cause, areas that are protected by the Fourth Amendment if they obtain the possessor's voluntary consent

---

[9] The Eleventh Circuit dealt with a search at 11:45 p.m. Ramirez-Chilel, 289 F.3d at 751 n.8.  As the Circuit noted in that case, "[n]ighttime searches are deemed to be more intrusive than daytime searches, and the assemblage of law enforcement officers at one's door in the middle of the night has a tendency to be more coercive than during the day."  Id.  That being said, the Court finds here, as the Eleventh Circuit did in Ramirez-Chilel, that based upon the totality of the circumstances, "the fact that the search occurred at midnight does not by itself negate the voluntariness of [the Beardens'] consent to search."  Id.

13

to search.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  The government

bears the burden of proving both the existence of consent and that the consent was

given freely and voluntarily.  United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir.

1993).  "The voluntariness of the consent must be judged in the light of the totality

of the circumstances."  United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir.

1995).  "[T]he absence of intimidation, threats, abuse (physical or psychological),

or other coercion is a circumstance weighing in favor of upholding what appears to

be a voluntary consent."  United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973).[10]

     In determining the voluntariness of consent, a reviewing court must examine

several non-exclusive factors, such as:  (1) whether Mr. or Ms. Bearden were free to

leave; (2) whether there was coercive police procedure; (3) the extent of Mr. or Ms.

Bearden's cooperation or awareness of a right to refuse to consent; (4) whether Mr.

or Ms. Bearden could refuse to consent; (5) the extent of Mr. or Ms. Bearden's

education and intelligence; and (6) Mr. or Ms. Bearden's belief that no incriminating

evidence would be found.  See Ramirez-Chilel, 289 F.3d at 752; see also United

States v. Gonzalez, 71 F.3d 819, 830-31 (11th Cir. 1996).

_____

     [10] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

14

The totality of the facts and circumstances surrounding the Beardens' consent to search the residence show that it was freely and voluntarily given.  Neither Mr. nor Ms. Bearden were under arrest or threatened with arrest; they were not forcibly detained prior to giving consent; and they had been advised that they could order the officers to leave.  Moreover, they appeared to be at ease with the officers and cooperated readily, rather than reluctantly.  Although Ms. Bearden was aware that incriminating evidence would be found in the vehicle, any contention that consent was coerced is unsupported in the record.  There is no testimony indicating that all six agents were at the door at one time.  Only three officers entered; and only two remained inside.  There is no evidence that the officers intimidated the Beardens into granting consent.  Moreover, there is no evidence that weapons were drawn, threats were made, or that Mr. or Ms. Bearden were operating under some disability that would have prevented them from denying the request for consent.[11]

_____

[11] The circumstances presented here are far less coercive than those in which the Eleventh Circuit has held that consent was voluntarily given.  See United States v. Delancy, 502 F.3d 1297, 1302 (11th Cir. 2007) (consent search of home upheld where third party resident who gave consent "testified that one of the officers held a rifle pointed towards her and her children, and that she 'felt like a hostage . . . like I was going to jail.'"); Hidalgo, 7 F.3d at 1571 (holding consent voluntary where the defendant signed a consent to search his residence after he had been "arrested by SWAT members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); United States v. Garcia, 890 F.2d 355, 361

15

With regard to suppression of any statements that she made during or after the consent search, defendant does not argue <u>Jackson v. Denno</u>, 378 U.S. 368 (1964), in her Brief. Thus, defendant has apparently abandoned the argument that he statements should be suppressed.  Nevertheless, the Court undertakes that analysis.

<u>Jackson v. Denno</u> holds that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury.  378 U.S. at 376-77.  A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, the Court must consider whether the Government complied with the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).   Second, if those

---

(11th Cir. 1989) (holding consent voluntary despite officers' refusal to accept suspect's conditional consent to search and threats to attempt to obtain a search warrant if the suspect did not consent to a full search of his residence); <u>United States v. Long</u>, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if refused, they would return and "dig the place up" to attempt to find counterfeit currency they suspected was buried in the yard); <u>United States v. Espinosa-Orlando</u>, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn); <u>United States v. Turner</u>, 628 F.2d 461, 466 (11th Cir. 1980) (consent valid where "'[t]here were repeated requests for permission to search within a three to five minute period . . . [defendants] stated they never felt free to walk away'" and "'the impression created by [the officer's] explanation was that a search would be conducted regardless of any objections [defendants] might raise.'").

16

requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary.  United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam).

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."  384 U.S. at 478.  Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege.  Id. at 478-79, 86 S. Ct. at 1630.  These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation."  Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

However, a suspect is only entitled to Miranda warnings when he is interrogated while in custody, because such circumstances are presumed to exert pressure on him to speak.  Miranda, 384 U.S. at 444.  In determining whether a person was in custody, a court looks to whether he was physically deprived of his freedom in any significant way or if a reasonable person in the defendant's position

17

would have understood that his freedom was so restrained. United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010). "'[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Yarborough v. Alvarado, 541 U.S. 652, 662 (2004) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). Thus, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

Accordingly, "[c]ourts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" Yarborough, 541 U.S. at 663, (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)); see also United States v. Brown, 441 F.3d 1330, 1349 (11th Cir. 2006) ("No particular fact in the 'custody' analysis is outcome determinative–we simply weigh the totality of the circumstances."). "[U]nder the objective standard,

18

the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person."  <u>Moya</u>, 74 F.3d at 1119.  "In applying this test there are several factors we are to consider, including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'"  <u>United States v. Street</u>, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting <u>United States v. Long</u>, 866 F.2d 402, 405 (11th Cir. 1989)).

The testimony at the hearing revealed that defendant was never in custody. She was free to move around the home.  <u>See</u> <u>United States v. Luna-Encinas</u>, 603 F.3d 876, (11th Cir. 2010) (defendant was not in custody for <u>Miranda</u> purposes when, <u>inter alia</u>, officers asked him to sit in his front yard while they conducted a search for a drug suspect who they thought had entered defendant's residence; officers told defendant he was not the drug suspect; the encounter lasted five minutes; no one touched defendant or intimidated him verbally or physically; no handcuffs were employed or guns drawn; defendant never asked to leave the premises).  Moreover, Agent Mueller advised the Beardens from the inception of their contact that they were not under arrest, that they could refuse to answer questions, and that they could require the officers to leave at any time.  Under the

19

law, advice to a suspect that he was not under arrest, and that he was free to leave at any time "is a fact of substantial importance in determining whether a reasonable person would have felt free to leave." United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

Because Ms. Bearden was not in custody, it was not necessary for Agent Mueller to read the Miranda rights to her before questioning her. See Luna-Encinas, 603 F.3d at 882 (because Luna-Encinas was not in "custody" when he made the statements leading to the discovery of the firearm, the officers were under no obligation to advise him of his Miranda rights, and no Fifth Amendment violation occurred). Because no Miranda warnings were required, it is unnecessary to consider whether Ms. Bearden's statements were voluntarily made. Nevertheless, the record shows that she spoke freely and voluntarily to Agent Mueller. Thus, there are no grounds for the Court to suppress defendant's statements.

20

IV.   **CONCLUSION**

For the reasons explained above, the undersigned **RECOMMENDS** that

defendant's Motions to Suppress Evidence [48] and Statements [60] be **DENIED**.

**SO RECOMMENDED**, this 17th day of April, 2013.


_____

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

21