IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF
AMERICA

v.                                    CRIMINAL ACTION FILE NO.:
                                      4:12-CR-28-02-HLM

AMY BEARDEN,

     Defendant.

## ORDER

This matter is before the Court on Defendant's Motion

to Suppress Evidence [48] and Motion to Suppress

Statements [60], and on the Non-Final Report and

Recommendation of United States Magistrate Judge Walter

E. Johnson [68].

AO 72A
(Rev.8/82)

## I.  Standard of Review

28 U.S.C. § 636(b)(1) requires that, in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  The Court therefore must conduct a <u>de novo</u> review if a party files "a proper, specific objection" to a factual finding contained in the report and recommendation. <u>Macort v. Prem, Inc.</u>, 208 F. App'x 781, 784 (11th Cir. 2006).  If no party files a timely objection to a factual finding in the report and recommendation, the Court reviews that finding for clear error.  <u>Id.</u> at 784.  Legal conclusions, of course, are subject to de novo review whether a party

2

AO 72A
(Rev.8/82)

specifically objects.   <u>United States v. Keel</u>, 164 F. App'x 958, 961 (11th Cir. 2006).

## II.   Background

### A.   Facts[1]

In May 2012, Special Agent Michael Karnbach of the Georgia Drugs and Narcotics Unit approached federal Drug Enforcement Administration ("DEA") Special Agent Christopher Mueller with information he had received from the Whitfield County Sheriff's Department and a defendant cooperating with the Federal Bureau of Investigation ("FBI"). (Tr. (Docket Entry No. 64) at 4-5.)   Specifically, Agent

---

[1]Because Defendant did not file any objections to Judge Johnson's Non-Final Report and Recommendation (<u>see generally</u> Docket), this statement of facts draws from all of Judge Johnson's factual findings that pass the clear error threshold and which the Court deems relevant to the instant Motions.

Karnbach told Agent Mueller that an employee of the Living Well Pharmacy (the "Pharmacy") had been stealing scheduled narcotic drugs from the Pharmacy and turning them over to the cooperating defendant for resale. (Id. at 5.) Defendant worked at the Pharmacy. (Id. at 6.)

On June 4, 2012, law enforcement conducted surveillance at the Pharmacy and of its employee, co-Defendant Sheila Cagle. (Tr. at 5-6.) The agents observed co-Defendant Cagle meet with co-Defendant Amy Johnson. (Id. at 5.) In a consensual interview with law enforcement later that day, co-Defendant Johnson disclosed that she had received two bottles of oxycodone from co-Defendant Cagle. (Id. at 5-6.)[2] Believing that the "cat was out of the

_____

[2]A concurrent inventory of the drugs on hand at the Pharmacy revealed that two bottles of oxycodone were missing, and a review

4

bag" after the interview with co-Defendant Johnson, the agents elected to proceed quickly with their investigation in case there was further evidence that could be seized that day. (Tr. at 6-7.)[3]

Accordingly, that same day, the agents went to co-Defendant Cagle's residence at approximately 9:45 p.m., conducted an interview, and seized her cellular telephone. (Id. at 7, 19.) The agents subsequently learned that co-

---

of surveillance video from the Pharmacy showed that co-Defendant Cagle had taken those bottles. (Id. at 6, 21.)

[3]Agents learned that co-Defendants Johnson and Cagle were related, and feared that co-Defendant Cagle might receive warning that police had seized drugs and were investigating the theft and distribution of pills. (Tr. at 7.) In fact, co-Defendants Johnson and Cagle had been communicating via text messages. (Id.) Moreover, when agents arrived at co-Defendant Cagle's residence, co-Defendant Johnson's husband was there, which confirmed the agents' suspicions. (Id. at 7-8.)

Defendant Johnson had traveled to co-Defendant Cagle's home to warn her about the investigation.  (Id. at 7-8.)

Because the suspected conspirators had received warning of the agents' activities, the agents were concerned that any evidence at Defendant's home could be destroyed; thus, because it would be quicker than obtaining a search warrant, they traveled to her home despite the late hour to conduct a "knock and talk."[4] (Tr. at 8, 17, 27-28.) Dressed in plain clothes, six agents arrived in two unmarked vehicles at Defendant's residence in Murray County, Georgia, at

---

[4]A "knock and talk" is an "investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for the police interest." United States v. Norman, 162 F. App'x 866, 869 (11th Cir. 2006) (per curiam).

6

11:45 p.m. (Id. at 8-9, 20.)  The officers were armed, but at no time did they brandish their guns. (Id. at 9, 11, 20, 22.)

As the officers proceeded down Defendant's long driveway, Agent Mueller recognized Defendant's pickup truck and observed that a light was on at the residence. (Tr. at 9.)  Agent Mueller and Sergeant Paul Woods of the Whitfield County Sheriff's Office went to the front porch; Agent Karnbach stood at the bottom of the porch stairs; and the other three officers either remained in their vehicle or stood at a distance away from the porch. (Id. at 9, 27.) The front porch light was on. (Id. at 9, 19-20, 27.)

Agent Mueller knocked on the front door, and Defendant's husband, Jason Bearden, came to the door and greeted them.   (Tr. at 9.)   Displaying his DEA

7

credentials, Agent Mueller introduced himself and the other two officers standing close by, told Mr. Bearden that he was interested in speaking to Defendant, and asked if they could come inside.   (Id. at 9-10.)   Mr. Bearden invited Agent Mueller, Sgt. Woods, and Agent Karnbach into the residence.   (Id. at 10.)   He apologized for the crowded condition of the home, and called for his wife to come out and meet with the officers. (Id.) Their children were asleep, so the agents sought to be as quiet as possible. (Id. at 22.)[5]

When Defendant appeared, Agent Mueller told her that he was there to speak to her about her job and thefts of drugs from the Pharmacy.   (Tr. at 10.)   Defendant

---

[5]There was no testimony indicating that, despite the late hour, Defendant and Mr. Bearden had been asleep or were dressed in sleep attire. (See generally Tr.)

8

responded, "Well, I didn't take that many." (Id.) Agent Mueller then told Defendant that she was not under arrest, that she did not have to answer his questions, and that the officers would leave her house at any time if she so requested. (Id.) The record does not reflect that Defendant ever refused to talk or that she ever asked the officers to leave. (Id. at 11; see generally Tr.) Agent Mueller did not provide Miranda warnings to Defendant because he did not believe that she was in custody; he testified that he would have allowed her to move freely around her home if she had desired. (Id. at 31-32.)

Agent Mueller then asked if there was a place where they could sit and talk. (Tr. at 11.) Because the home's front room was very small, Defendant invited the officers to

9

join her in the living room; Agents Mueller and Karnbach sat

with Defendant while Sgt. Woods asked Mr. Bearden if he

would come outside with him because it was so crowded

inside. (Id. at 11, 27.)  According to Agent Mueller, nothing

about his demeanor was threatening,[6] Defendant appeared

to understand what he was saying, and he understood what

she was saying.  (Id. at 11.)

During the conversation, Defendant admitted that she

had been stealing pills from the Pharmacy and giving them

to others who had run out of medications.  (Tr. at 12.)  She

───────────────────

[6]According to Judge Johnson, Agent Mueller stated that "he never threatened" Defendant.   (Non-Final   Report   and Recommendation at 6.)  However, the text preceding this footnote is more consistent with Agent Mueller's testimony.  (Tr. at 11.) Specifically, Agent Mueller was asked: "Anything about your demeanor that was threatening, you believe, to [Defendant]?" to which he responded "No."  (Id.)  Agent Mueller additionally stated that his gun was not drawn at this time.  (Id.)

10

also stated that sometimes people would bring medications to her and she would use them. (Id.) Defendant also stated that she was supposed to have made some drug deliveries, so there were some pills in her truck. (Id.) Agent Mueller then asked Defendant for consent to search her residence (including the truck), and she agreed. (Id. at 12, 14.) He then presented a consent to search form to Defendant, which states, in relevant part:

> 1.   I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the persons, places or things to be searched.)

> Residence at 166B Floodtown Circle, Eton, Georgia
> 2012 Nissan Pickup License Ga. C4H-4761

> 2.   I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.
> 3.   I FREELY CONSENT TO THIS SEARCH.

11

(Tr. Gov't Ex. 1; see also Tr. at 13, 32.)  Defendant signed the consent form.  (Tr. at 13, 32.)  Agent Mueller then took the consent form to Mr. Bearden, explained to him what was going on, and obtained his signature on the form.  (Id. at 13, 32.)  Agents Mueller and Karnbach signed the consent form as witnesses.  (Id. at 32.)

After executing the consent form, the officers began their search. (Tr. at 14.) Agent Karnbach located a number of pill bottles containing medications in other individuals' names in the kitchen, and agents Duane Holmes and Jeff Silvers located two pill bottles in other individuals' names in the pickup truck. (Id. at 14, 16.)[7] Defendant explained that

_____

[7]Although there may have been another vehicle on Defendant's property that night, Agent Mueller only recalls officers searching the pickup truck.  (Tr. at 32-33.)   The Government agreed that it would only attempt to introduce evidence found in the

AO 72A
(Rev.8/82)

some of those pills had been given to her by others (which she would take herself or give away) and that some were supposed to be delivered to others.  (Id. at 14, 16.) Defendant denied having received anything of value for the pills.  (Id. at 41-42.)  Agent Mueller testified that Defendant was very calm during the entire encounter and extremely helpful.  (Id. at 15.)[8]

When the search was over, Agent Mueller explained to Defendant and her husband that the agents would present their case to the U.S. Attorney's Office and make a determination of what to do next; then they left.  (Tr. at 16.)

---

home and the pickup truck.  (Id. at 43.)

[8]Agent Mueller further reported that Mr. Bearden "was extremely friendly during the entire encounter and both [he and Defendant] were very friendly and polite with us."  (Tr. at 16.)

13

AO 72A
(Rev.8/82)

## B.   Procedural Background

On September 25, 2012, a grand jury for the Northern District of Georgia returned a multi-count Indictment against Defendant, as well as co-Defendants Sheila Cagle, Amy Johnson, and Jeremiah Fiek (the "co-Defendants"). (Docket Entry No. 1.)   The Indictment asserts that Defendants violated 21 U.S.C. § 841(a)(1), that is, to knowingly and intentionally distribute, dispense, and possess with intent to distribute and dispense oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).  (Id. at 4-5.)

On November 13, 2012, Defendant filed a Motion to Suppress All Evidence Obtained as a Result of the Illegal Search of her Residence ("Motion to Suppress Evidence").

14

(Docket Entry No. 48.)  On January 11, 2013, Defendant filed a Motion to Amend/Correct ("Motion to Suppress Statements") in which she clarified that her Motion to Suppress covered "all testimony regarding statements made by [Defendant] and her husband during the search of her residence." (Docket Entry No. 60 at 2.)

Judge Johnson conducted an evidentiary hearing on Defendant's Motions on February 4, 2013.  (Docket Entry Nos. 63, 64.)  Defendant submitted a post-hearing brief in support of her Motions (Docket Entry No. 66), and the Government responded thereto (Docket Entry No. 67).

On April 17, 2013, Judge Johnson issued his Non-Final Report and Recommendation, advising the Court to deny Defendant's Motions.  (Docket Entry No. 68.)  The time

15

period in which Defendant could file objections to that report has expired, and Defendant has not filed any.  (See generally Docket.)  The Court therefore finds that the instant Motions are ripe for resolution.

## III.  Discussion

Defendant contends that the officers' warrantless search of her residence and pickup truck violated the Fourth Amendment; therefore, she contends that all of the evidence discovered during that search and any statements she made while the officers were on her property should be suppressed. (Br. Supp. Mot. Supp. Evidence (Docket Entry No. 48) at 1-2; Br. Supp. Mot. Supp. Statements (Docket Entry No. 60) at 2-3.)  The Government responds that "[a]s demonstrated by the testimony offered at the [evidentiary]

16

hearing, [Defendant's] claims lack merit and should be denied." (Br. Opp. Def.'s Mots. (Docket Entry No. 67) at 1.) Judge Johnson agreed with the Government and recommended that the Court deny Defendant's Motions. (Final Report and Recommendation at 10-21.)

For the reasons contained in Judge Johnson's thorough Non-Final Report and Recommendation, the Court agrees that Defendant's Motions should be denied. (Non-Final Report and Recommendation at 10-21.) Specifically, for the reasons outlined by Judge Johnson, the Court first finds that the officers were lawfully present on Defendant's property, and that Defendant's husband "freely invited the officers into his residence" before Defendant executed the consent to search form and made any statements to the

17

officers.  (Id. at 10-13.)  Regarding the Motion to Suppress

Evidence, for the reasons Judge Johnson enumerates, the

Court finds that the totality of the circumstances indicate

that Defendant and her husband freely and voluntarily

consented to the officers searching their home and

Defendant's pickup truck; therefore any evidence

discovered therein is admissible. (Id. at 13-15.)[9] Regarding

the Motion to Suppress Statements, for the reasons

explained by Judge Johnson, the Court agrees that "there

are no grounds for the Court to suppress [D]efendant's

statements." (Id. at 15-20.)[10]

---

[9]The Court especially agrees with Judge Johnson that "[t]he circumstances presented here are far less coercive than those in which the [United States Court of Appeals for the] Eleventh Circuit has held that consent was voluntarily given." (Non-Final Report and Recommendation at 15-16 n.11 (collecting cases).)

[10]Although the matter is close, the Court agrees with Judge

18

In sum, for the reasons discussed above, the Court denies Defendant's Motion to Suppress Evidence and Motion to Suppress Statements.

## IV. Conclusion

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [48], and **DENIES** Defendants' Motion to Suppress Evidence [48] and Motion to Suppress Statements [60].

---

Johnson that based on the testimony at the evidentiary hearing, Defendant was not in custody when she made the statements she now seeks to suppress; thus, the officers' failure to give <u>Miranda</u> warnings to Defendant does not preclude the Government from introducing Defendant's statements. (<u>See</u> Non-Final Report and Recommendation at 19-20 (noting that Agent Mueller advised Defendant from the outset that she was not under arrest, could refuse to answer the officers' questions, and could ask the officers to leave at any time).)

19

AO 72A
(Rev.8/82)

IT IS SO ORDERED, this the 13 day of May, 2013.

UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)